EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Rosa Lydia Vélez y otros<br><br>    Peticionaria<br><br>        v.<br><br>Departamento de Educación y otros<br><br>    Recurrida | 2022 TSPR 38<br><br>208 DPR ____ |

Número del Caso:  CC-2021-568

Fecha: 4 de abril de 2022

Tribunal de Apelaciones:

    Panel III

Abogados de la parte peticionaria:

    Lcdo. José E. Torres Valentín
    Lcda. Marilucy González Báez
    Lcdo. José J. Nazario De La Rosa
    Lcdo. Carlos E. Gómez Menéndez

Oficina del Procurador General:

    Lcdo. Fernando Figueroa Santiago
    Procurador General

    Lcdo. Omar Andino Figueroa
    Subprocurador General

    Lcda. Carmen A. Riera Cintrón
    Procuradora General Auxiliar

Materia: Resolución del Tribunal con Voto Particular de Conformidad y Voto Particular Disidente.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Rosa Lydia Vélez y otros<br><br>Peticionaria<br><br>v.<br><br>Departamento de Educación y otros<br><br>Recurrida | CC-2021-0568 | Certiorari |
|---|---|---|

RESOLUCIÓN

En San Juan, Puerto Rico, a 4 de abril de 2022.

Examinada la *Solicitud de desestimación por academicidad* presentada por el Departamento de Educación (DE), por conducto de la Oficina del Procurador General de Puerto Rico, se declara con lugar.

El caso de referencia se ha tornado académico a consecuencia de cambios fácticos durante el trámite judicial. Asoc. Fotoperiodistas v. Rivera Schatz, 180 DPR 920, 932 (2011). Esto se debe a que en la solicitud de desestimación se anejó una *Determinación Administrativa sobre compensación de servicios educativos y de terapias durante el periodo del 16 de marzo al 5 de junio de 2020*. En esta se determinó que se le concede el derecho a los estudiantes registrados en el Programa de Educación Especial(PEE), que no recibieron servicios educativos ni servicios relacionados —según se establece en su Programa Educativo Individualizado— a recibir los servicios relacionados compensatorios según se establece en la Sentencia por Estipulación; y los servicios educativos compensatorios que en la reunión correspondiente de Comité de Programación y Ubicación (COMPU) se determinen apropiados.

Después de esta *Determinación Administrativa*, la intervención de este Tribunal en este caso resultaría en un "uso innecesario de los recursos judiciales" y en "precedentes que resulten superfluos". Íd.

La razón por la cual el recurso se convirtió en académico con la promulgación de la *Determinación Administrativa* del Departamento de Educación radica en que la única controversia ante este Tribunal era: Si los

estudiantes de Programa de Educación Especial tienen derecho a recibir servicios compensatorios por servicios relacionados dejados de recibir a partir del 16 de marzo de 2020 al 5 de junio de 2020. Esto surge de la *Petición de Certiorari* presentada por la Sra. Rosa Lydia Vélez. Igualmente en el recurso de certiorari la súplica se limita a indicar que este Tribunal establezca que los estudiantes registrados en el Programa de Educación Especial, que no recibieron servicios educativos ni servicios relacionados a partir del 16 de marzo de 2020, tienen derecho a recibir servicios compensatorios y ordene a la agencia proveer a los y las estudiantes del Programa de Educación Especial: (1) los servicios compensatorios según establece la Sentencia por Estipulación; y (2) los servicios educativos compensatorios que en la reunión de COMPU correspondiente se determine sean apropiados.

Debido a que el remedio concedido por la *Determinación Administrativa* es el mismo que nos solicita la señora Vélez en su recurso de certiorari, este último ha dejado de exponer una controversia. Pues, "[l]os tribunales sólo debemos intervenir en controversias reales y vivas, en las cuales existan partes con intereses encontrados cuyo propósito sea obtener un remedio que tenga un efecto sobre la relación jurídica". Asoc. Fotoperiodistas v. Rivera Schatz, supra, pág. 931.

Ahora bien, se argumenta que el remedio propuesto en la determinación administrativa no es el adecuado. La determinación sobre si la administración de los servicios compensatorios será adecuada sobrepasa nuestra competencia sobre el presente recurso, la cual está limitada a la controversia antes indicada. En otras palabras, el remedio provisto por el Departamento de Educación a través de la *Determinación Administrativa* es el adecuado en tanto satisface la súplica de la señora Vélez y resuelve su recurso.

En cuanto al argumento de que la *Determinación Administrativa* no garantiza de manera clara que, en eventos similares subsiguientes, el Departamento de Educación no se rehusará nuevamente a proveer servicios compensatorios, igualmente, sobrepasa la capacidad cognoscitiva de este Tribunal hacer una determinación a esos fines. Este argumento hace referencia a la excepción de academicidad de cesación voluntaria sin visos de permanencia. En U.P.R. v. Laborde Torres y Otros I, 180 DPR 253 (2010), tuvimos la oportunidad de abundar sobre esta excepción. Así expresamos que "la terminación voluntaria de una conducta no tornará académica una controversia salvo que los eventos subsiguientes hagan absolutamente claro que no es razonable esperar que la alegada conducta impugnada vuelva a ocurrir". Íd., págs. 282-283. La *Determinación Administrativa* concediendo el remedio

solicitado por los peticionarios se acaba de proclamar. Este hecho atado con nuestra expresión en U.P.R. v. Laborde Torres y Otros I, supra, deja de manifiesto que es imposible que determinemos en esta etapa si la cesación voluntaria del Departamento de Educación es sin visos de permanencia. Concluir otra cosa sería especular.

Por último, en Moreno v. Pres. U.P.R. II, 178 DPR 969, 975 (2010), expresamos que cuando un caso se torna académico, el tribunal revisor tiene el deber de desestimar el recurso apelativo y dejar sin efecto el dictamen revisado y devolver el caso con instrucciones de que se desestime. Indicamos, que el "propósito de esta norma es evitar que un dictamen que se tornó académico siga en vigor y obligue a las partes". Íd. Por tanto, a la luz de la normativa expuesta, procede dejar sin efecto la determinación del Tribunal de Apelaciones. En su lugar, procede ordenar la continuación de los procedimientos en el Tribunal de Primera Instancia.

Por los fundamentos anteriores, el recurso ante nuestra consideración es académico, por lo cual se deja sin efecto la determinación del Tribunal de Apelaciones, y se devuelve el caso al Tribunal de Primera Instancia para la continuación de los procedimientos de conformidad a lo aquí dispuesto.

**Notifíquese**.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Martínez Torres emitió un Voto Particular de Conformidad, al cual se unieron la Jueza Asociada señora Pabón Charneco, el Juez Asociado señor Kolthoff Caraballo, el Juez Asociado señor Rivera García y el Juez Asociado señor Feliberti Cintrón. El Juez Asociado señor Estrella Martínez emite un Voto Particular Disidente. La Jueza Presidenta Oronoz Rodríguez y el Juez Asociado señor Colón Pérez no intervinieron.


                              Javier O. Sepúlveda Rodríguez
                              Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Rosa Lydia Vélez y otros

     Peticionaria

       v.

Departamento de Educación y otros         CC-2021-0568

     Recurrida

Voto Particular de Conformidad emitido por el Juez Asociado señor MARTÍNEZ TORRES al cual se unieron la Jueza Asociada señora PABÓN CHARNECO, el Juez Asociado señor KOLTHOFF CARABALLO, el Juez Asociado señor RIVERA GARCÍA y el Juez Asociado señor FELIBERTI CINTRÓN

En San Juan, Puerto Rico, a 4 de abril de 2022.

El Juez Asociado William O. Douglas dijo una vez, con mucha razón, que las opiniones individuales de los jueces en un foro colegiado son indispensables. Su razonamiento era que siempre habrá discrepancias jurídicas porque la incertidumbre en muchas áreas del Derecho es una condición necesaria de la democracia. William O. Douglas, The Dissent: A Safeguard of Democracy, 32 J. Am. Judicature Soc. 97, 106 (1948).

La función de este Tribunal es resolver esa incertidumbre y pautar Derecho en la medida que tenga ante sí una controversia viva. Sin ese caso y controversia justiciable no podemos pautar nada, pues

nuestra función constitucional no es ocupar el lugar de las otras ramas del gobierno para intervenir en cada asunto de interés general. Al ejercer nuestra función de resolver controversias y pautar Derecho, es natural que en un foro colegiado como este surjan discrepancias. La comunidad jurídica tiene derecho a conocerlas. Esa es la importancia y el valor institucional de los votos y opiniones disidentes, concurrentes y de conformidad.

Esas expresiones separadas suelen ser vehementes y razonadas. Pueden ser cáusticas, fuertes y apasionadas. También pueden ser todo lo contrario: templadas, escuetas y carentes de llamados a la emoción del lector. Como toda otra expresión individual, su contenido lo decide su autor.

La tradición en un foro colegiado como el nuestro es tolerar y propiciar ese debate de ideas jurídicas. Se parte de la premisa de que nadie tiene el monopolio de la verdad, pero todos estamos convencidos de la corrección de nuestras posturas y la incorrección de la posición contraria. Por eso, cuando esa otra postura prevalece, expresamos nuestra posición por separado. No obstante, por respeto a la institución y al Pueblo que servimos, siempre es preferible hacer constar que concurrimos o disentimos "respetuosamente".

Esa frase tiene el propósito de mantener la legitimidad del Tribunal ante la sociedad, así como la colegialidad y civismo entre sus integrantes. Solo se omite hacer constar que la discrepancia es respetuosa cuando la posición

contraria es tan chocante que carece de fundamentos jurídicos o no es producto de una consideración razonada entre los Jueces. En otras palabras, la discrepancia no puede ser respetuosa cuando el Juez que disiente está convencido de que la decisión del Tribunal es ilegítima. En ese momento, sacrifica su interés en mantener un ambiente de camaradería porque considera que es más importante que el Pueblo conozca que el Tribunal se ha apartado de su deber de mantenerse en la esfera del Derecho o ha resuelto de manera irreflexiva e irresponsable. Es una evaluación muy personal del Juez que discrepa. Véase Note, From Consensus to Collegiality: The Origins of the "Respectful Dissent", 124 Harvard L. Rev. 1305 (2011).

Hoy se acompaña un Voto disidente que no se hace "respetuosamente". En otras palabras, se pone en entredicho al Tribunal, no porque nuestra decisión carezca de fundamentos jurídicos o se haya producido ilegítimamente, sino meramente porque el hermano Juez disidente discrepa.

No es la primera vez. En una ocasión, acusó a la mayoría de hacer "un ejercicio de poder extremista y desmedido" y que intentamos imponer, "no solamente en la jurisprudencia", un "[e]xtremismo basado en el odio…". In re Desig. Miembros Com. Eval. Judicial, 2021 TSPR 113, 207 DPR ___ (2021). (Expresión del Juez Asociado señor Estrella Martínez). Esto fue meramente porque discrepó sobre el nombramiento de una persona a la Comisión de Evaluación Judicial.

En otra ocasión, luego de un debate entre los miembros del Tribunal, expresó que se llenaron las vacantes en la Comisión de Disciplina Judicial sin que antes hubiera "un diálogo sereno, objetivo, colegiado entre todos los miembros de este Tribunal". In re Desig. Miembros Com. Disc. Judicial, 2021 TSPR 119, 207 DPR ___ (2021). (Expresión del Juez Asociado señor Estrella Martínez). Resultó que sí hubo un dialogo entre todos los miembros del Tribunal. Lo que pasó fue que las recomendaciones del hermano Juez Asociado no obtuvieron el aval mayoritario.

Recientemente, luego de que el Tribunal solicitó a las partes que nos informaran si tenían un acuerdo o preacuerdo en el caso ante nuestra consideración, insertó insinuaciones contra los Jueces en mayoría y expresó que la decisión del Tribunal era un "giro inusual" y que "este Tribunal decidió adoptar un rol al extremo proactivo en la búsqueda de obstáculos jurisdiccionales". Pueblo v. O'Neill García II, 2022 TSPR 26, 208 DPR ___ (2022). (Expresión del Juez Asociado señor Estrella Martínez). Resultó que teníamos razón y había un acuerdo firmado por las partes. Evitamos emitir una opinión consultiva.

Hoy nos acusa de resolver con "indiferencia y complacencia". Voto particular disidente del Juez Asociado señor Estrella Martínez, pág. 43. Nos recrimina porque "[h]ace falta carácter...". Íd., pág. 44.

Contrario a esa retórica, basta evaluar la solicitud de certiorari con la reglamentación que el Departamento de

Educación aprobó posteriormente, para darse cuenta de que este recurso no presenta una controversia viva:

| Súplica de la parte peticionaria en su recurso de <u>certiorari</u>. | Determinación Administrativa sobre compensación de servicios educativos y de terapias durante el periodo del 16 de marzo al 5 de junio de 2020 |
|---|---|
| La parte peticionaria solicita que se "ordene a la agencia a proveer a los y las estudiantes del Programa de Educación Especial (1) los servicios relacionados compensatorios según establece la Sentencia por Estipulación; y (2) los servicios educativos compensatorios que en la reunión de COMPU correspondiente se determine sean apropiados". | A los estudiantes del Programa de Educación Especial "se les concederá el derecho a recibir los servicios relacionados compensatorios según se establece en la Sentencia por Estipulación; y los servicios educativos compensatorios que en la reunión de Comité de Programación y Ubicación (COMPU) correspondiente se determinen sean apropiados". |

A pesar de lo anterior, la disidencia insiste en su ataque personalista a los que votamos para archivar este recurso. ¿Por qué? Porque discrepa.

¿La "falta de carácter" o la "indiferencia y complacencia" es solo cuando no estamos de acuerdo con sus posturas o también cuando votamos conforme con las opiniones, sentencias, votos de conformidad, concurrentes, disidentes y expresiones que el hermano Juez disidente suscribe?

Soy de los que piensa que se necesita carácter para reconocer cuál es nuestra función constitucional de resolver casos y controversias y no caer en la tentación de creernos "Dioses del Olimpo" y pretender resolverlo todo, aunque no nos corresponda. Precisamente hace falta carácter para

reconocer nuestra autolimitación judicial y no buscar la pauta. De esa forma honramos nuestro juramento ante el Pueblo, nuestro soberano.

Soy partidario del disenso robusto y el debate de ideas en un cuerpo colegiado como el nuestro. Es necesario y saludable. Ahora bien, somos Jueces y nuestros escritos deben estar fundamentados en Derecho y no para buscar aplausos o atención mediática. Incluso, creo que hay disertaciones válidas para un artículo de revista jurídica que no lo son para una opinión judicial en un recurso en el que no hay una controversia jurídica por resolver. Si nos desviamos de nuestra función constitucional, expresaré mi disenso firme. Por eso, cuando en una ocasión dos compañeros de este Tribunal no fundamentaron sus ponencias con argumentos jurídicos y, en cambio, lo hicieron con alegaciones políticas, les dije que los fundamentos de sus opiniones no eran jurídicos, lamentablemente. Por el contrario, parecían un jingle político. Com. Elect. MVC v. Press. CEE, 205 DPR 836, 855 (2020) (Expresión del Juez Asociado señor Martínez Torres).

Se puede disentir con firmeza -y hasta con indignación, ironía, disgusto y coraje- sin necesidad de mancillar la Institución y calumniar el carácter de los Jueces hermanos que, en determinado momento, no comparten nuestro criterio. Incluso, se debe alertar al Pueblo cuando algo ande mal en este Tribunal. Así también se protege la Institución. Ahora bien, el disenso debe ser siempre contra los fundamentos de

la ponencia contraria y no contra el carácter de quienes la suscriben. Eso es lo que nuestra función constitucional nos exige.

Respetuosamente sometido.


RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Rosa Lydia Vélez y otros<br><br>Peticionaria<br><br>v.<br><br>Departamento de Educación y otros<br><br>Recurrida | CC-2021-0568 | Certiorari |

Voto particular disidente emitido por el Juez Asociado Señor ESTRELLA MARTÍNEZ.

En San Juan, Puerto Rico, a 4 de abril de 2022.

Con posterioridad a que este Tribunal expidiera el recurso y convocara a las partes a una vista oral, en reacción el Departamento de Educación nos presenta un documento en el que promete atender el reclamo de la parte peticionaria. ¿Basta como remedio la mera promesa recogida en un documento que ni siquiera cumple con los elementos mínimos del derecho administrativo y cuyo peso es menor que el del dictamen denegatorio emitido por el propio Departamento de Educación y avalado por los foros recurridos? Asimismo, al momento de evaluar el peso que esta promesa se merece, ¿no debemos tomar conocimiento judicial de que el Estado, a través de diversas administraciones, se ha caracterizado por quebrantar de forma rampante la Sentencia por estipulación que impera en este caso y, como consecuencia, ha estado sujeto a la imposición de miles de dólares en multas por sus múltiples

incumplimientos? ¿Acaso no dicta el Derecho que, ante la informalidad de la promesa y un historial plagado de inobservancias a los compromisos entre las partes, sea el Tribunal Supremo de Puerto Rico quien emita un dictamen con carácter vinculante con respecto a la obligación que pesa sobre el Estado con el estudiantado de educación especial?

**Ante la omisión de una Mayoría de este Tribunal para atender esas interrogantes, no se puede concluir que nos encontramos ante un ejercicio válido de autolimitación judicial. Todo lo contrario. Estamos ante un acto de evasión judicial del cumplimiento de otorgar un remedio con carácter vinculante para ambas partes.**

Al proceder de esta forma, una Mayoría de este Tribunal se desvincula desacertadamente de su rol de pautar el Derecho en una controversia de vital importancia en el pleito de clase activo más longevo y de mayor perfil en el Poder Judicial: el de miles de estudiantes con necesidades educativas especiales quienes, junto a sus padres, madres y encargados, han reclamado por décadas que el Gobierno de Puerto Rico (Gobierno) les brinde servicios educativos y relacionados en acorde con sus necesidades particulares y de conformidad con las leyes federales y estatales aplicables.

La corriente mayoritaria, anclada en un ejercicio extremo de autolimitación judicial, acude a la doctrina de la academicidad para justificar la desestimación del

pleito de epígrafe. Con este proceder, pasa por inadvertido que lo concedido por el Departamento de Educación (Departamento) es muy poco y, peor aún, llega demasiado tarde para escapar la revisión judicial.

Es lamentable el proceder mayoritario, pues no cabe duda de que el Derecho favorece a los miles de estudiantes con necesidades educativas especiales. De igual forma, estoy convencido de que el Gobierno, de haber obrado con sensibilidad y haberse apartado de la actitud litigiosa exhibida a través del trámite de este caso, no hubiese esperado a la intervención de este Tribunal para emitir promesas conducentes a atender el reclamo válido que nos ocupa. En ese sentido, lo anunciado por el Departamento es una determinación no vinculante, la cual reitero es muy poca y llega muy tarde, como para hacerle creer a los estudiantes, a la sociedad y a este juez que la controversia se ha tornado académica.

Ante ese cuadro, es menester enfatizar que las acciones y omisiones de los diversos componentes de las ramas de gobierno tienen consecuencias sociales, económicas y jurídicas en la ciudadanía. Las acciones y omisiones del Tribunal Supremo de Puerto Rico no son la excepción. Por ello, no puedo avalar que, tras expedir el recurso y convocar una vista oral, la Mayoría invoque una supuesta "academicidad" como subterfugio para evitar adentrarse en la controversia y pautar importantes aspectos sobre el derecho constitucional a la educación y

la obligación del Departamento a no negar arbitrariamente el acceso cabal del estudiantado de educación especial a tal derecho.

Dicha omisión se magnifica ante el hecho de que los foros recurridos fallaron en reconocer la existencia y preeminencia de ese derecho constitucional. El curso de acción seguido por este Tribunal abona a la incertidumbre jurídica a la cual continúan expuestos los sujetos de derecho vulnerables que estamos llamados a proteger: las y los estudiantes del Programa de Educación Especial. Por lo tanto, disiento.

Procedo entonces a consignar los fundamentos jurídicos que enmarcan mi disenso. Para situar esta controversia en su justa perspectiva, es preciso revisitar los hechos fácticos que originaron el pleito de clase, así como las circunstancias particulares que desembocaron en el caso de autos.

**I**

La presente controversia forma parte de una intrincada trayectoria judicial cuyo origen se remonta a más de cuatro (4) décadas.[1] El 14 de noviembre de 1980, la Sra. Rosa Lydia Vélez (señora Vélez)[2] instó una demanda de

---

[1] Para un análisis histórico del pleito de clase y sobre las barreras al acceso a la justicia que este caso ejemplifica, véase, L. Estrella Martínez, <u>Acceso a la Justicia: Derecho Humano Fundamental</u>, 1ra ed., San Juan, Ediciones SITUM, 2017, págs. 398-410.

[2] También conforman el pleito todos los niños y las niñas con necesidades educativas especiales y sus padres,

injunction y daños y perjuicios en contra del Departamento y el Gobierno.[3] En aquel entonces, se alegó que los estudiantes y sus progenitores habían atravesado un sinnúmero de situaciones en el sistema educativo público que le impedían recibir los servicios de educación especial.[4] Ante esa situación y con el fin de vindicar su derecho constitucional a la educación, la parte peticionaria acudió al Poder Judicial y reclamó que el Gobierno cumpliera con su responsabilidad de proveer acceso a una educación pública, gratuita y ajustada a las necesidades particulares del estudiantado de educación especial.

Por entender que el caso de la señora Vélez no se trataba de una situación aislada, sino que se reproducía a través de todo el sistema de enseñanza, el 10 de septiembre de 1981, el Tribunal de Primera Instancia certificó el pleito como uno de clase. Desde ese momento, se reconoce como parte demandante a todos los y las estudiantes con impedimentos menores de 21 años elegibles o participantes del Programa de Educación Especial manejado por el Departamento.[5]

_____

madres y encargados, además del Comité Timón de Padres de Niños con Impedimentos de Puerto Rico.

[3]El caso civil ante el Tribunal de Primera Instancia, Sala de San Juan, fue identificado con el alfanumérico KPE-80-1738(907), Vélez y otros v. Socorro Lacot y otros.

[4]Apéndice del certiorari, Demanda, págs. 225-245.

[5]En el año escolar 2019-2020, el total de estudiantes de educación especial ascendía a **103,318**. De estos:

Tras veintidós (22) años de litigio, el 14 de febrero de 2002, el foro primario emitió una Sentencia por estipulación, la cual puso fin al pleito.[6] A través de esta, el Tribunal aprobó ochenta y siete (87) estipulaciones mediante las cuales el Departamento se comprometió a tomar acciones afirmativas con relación a la educación y los servicios que proveería a su matrícula de educación especial. Con el objetivo de monitorear el cumplimiento con la sentencia, el tribunal retuvo su jurisdicción sobre el caso y, posteriormente, nombró un Comisionado Especial (Comisionado). Ante el Comisionado se ventilan periódicamente distintas controversias con relación al cumplimiento del Departamento con las estipulaciones y otros asuntos.

A la par con el transcurso de estos procesos y, como es de conocimiento general, a inicios del 2020, Puerto Rico, y en específico la región suroeste, experimentó el embate de un terremoto y sus posteriores réplicas. Tiempo después sobrevino la pandemia del Covid-19, la cual trastocó todos los aspectos de la vida en sociedad en el

---

a) **8,206** se encuentran entre las edades de 3-5 años, y

b) **95,112** están entre las edades de 6-21 años.

Véase, Estadísticas [del Programa de Educación Especial], https://de.pr.gov/educacion-especial/estadistica/ (última visita, 1 de abril de 2022).

[6]Apéndice del certiorari, Sentencia por estipulación, págs. 246-305.

País. Una de las principales secuelas de ambos eventos, principalmente por motivo de la pandemia, fue la disrupción del semestre escolar, lo que implicó el cierre físico de los planteles y la intermitencia en la provisión de los servicios educativos relacionados al estudiantado de educación especial a partir de marzo de 2020.

Es en este contexto que, como parte de los procedimientos de monitoreo, el 27 de mayo de 2020, se celebró una vista ante el Comisionado. Allí, la señora Vélez y el Departamento discreparon en cuanto a si este último estaba obligado a ofrecer servicios compensatorios debido a que no brindó servicios educativos relacionados a todos los estudiantes de educación especial durante el segundo semestre del año escolar 2019-2020. Concretamente, la discusión giró en torno a los estudiantes de la región suroeste, quienes no recibieron los servicios educativos relacionados desde enero de 2020, y en cuanto a todos los estudiantes del Programa de Educación Especial que no los recibieron a partir del 16 de marzo de 2020. Ante ello, el Comisionado ordenó a las partes a expresarse por escrito.

El 8 de junio de 2020, el Departamento compareció mediante una <u>Moción presentando posición con respecto a los derechos de los estudiantes a recibir servicios compensatorios y servicios educativos y otros asuntos</u>. En ella, aceptó que, desde el 16 de marzo de 2020, no brindó a todos los estudiantes de educación especial los

servicios educativos relacionados. Sin embargo, negó que tuviera que hacerlo bajo el fundamento de que, por motivo del cierre de las escuelas causado por la pandemia del Covid-19, dejó de proveer servicios educativos a toda su matrícula y culminó el semestre escolar. Ancló su postura en las Guías sobre prestación de servicios a niños con discapacidad durante la pandemia emitidas por el Departamento de Educación federal, las cuales establecen que, si la agencia educativa local cierra las escuelas **y** no proporciona algún servicio educativo a la población general de estudiantes, no tiene que ofrecerlos a los estudiantes de educación especial.[7]

Apoyado en ese razonamiento, el Departamento sostuvo que no tenía que ofrecer servicios educativos relacionados al estudiantado de educación especial porque, desde el 16 de marzo de 2020, no proveyó servicio educativo alguno a la totalidad de su matrícula de estudiantes. Por lo tanto, descartó que se generara a favor del estudiantado de educación especial un derecho recibir los servicios de forma compensada.

El 18 de junio de 2020, la parte peticionaria presentó su Réplica al escrito del Departamento. De entrada, señaló que era incuestionable que el Gobierno ordenó el cierre de escuelas públicas a partir del 16 de marzo de 2020 con

---

[7]Apéndice del certiorari, Questions and answers on providing services to children with disabilities during coronavirus disease 2019 outbreak, págs. 149-157.

el objetivo de no permitir la asistencia física de maestros y estudiantes a los centros escolares. Sin embargo, rechazó la postura del Departamento en cuanto a que desde ese momento culminó el semestre escolar y dejó de proveer servicios educativos. En cambio, señaló que el Departamento dio continuidad a las tareas pedagógicas del semestre a través de módulos educativos, plataformas de cursos en línea y cursos virtuales, entre otros. Como prueba de ello, hizo referencia a varias comunicaciones emitidas por el Departamento, las cuales confirmaban que los servicios educativos continuaron, pero en la modalidad a distancia. Particularmente, resaltó una comunicación emitida el 23 de abril de 2020 de la cual se desprende que el cierre del año escolar fue el 5 de junio de 2020.

De esta forma, la señora Vélez argumentó que el Departamento no podía escudarse en las Guías del Departamento de Educación federal para escapar a su responsabilidad ministerial con los estudiantes de educación especial, puesto que era claro que, a pesar del cierre de las escuelas, continuó brindando servicios educativos a la matrícula en general. Basado en lo anterior, sostuvo que, ante la indisponibilidad de todos los servicios educativos relacionados a causa de la pandemia, correspondía al Departamento proveerlos de forma compensatoria al estudiantado de educación especial, según establecido en la Sentencia por estipulación.

Tras evaluar ambas posturas, el 8 de julio de 2020, el Comisionado emitió una Resolución. En lo pertinente, resolvió que los estudiantes de educación especial no tenían derecho a reclamar que se les brindaran servicios educativos relacionados de forma compensada por el tiempo en que estuvieron sin recibirlos. Ello, al concluir lo siguiente:

> Ante la realidad de las circunstancias excepcionales del cierre de las escuelas y **que el Departamento no pudo continuar proveyendo servicios educativos a los y las estudiantes del sistema público, por un periodo prolongado de tiempo, el Departamento de Educación no tenía que ofrecer a los y las estudiantes del programa de educación especial los servicios relacionados durante el periodo de cierre de las escuelas por la pandemia.**
>
> Respecto a los y las estudiantes del programa de educación especial que no recibieron los servicios relacionados a consecuencia de los sismos que afectaron la Isla estos tendrán derecho a recibir el servicio relacionado no provisto como servicio compensatorio hasta la fecha del cierre de las escuelas como consecuencia de la pandemia.[8]

Tras una infructuosa petición de reconsideración, el 22 de septiembre de 2020, la señora Vélez solicitó al Tribunal de Primera Instancia la revocación parcial de la

---

[8](Negrillas suplidas). Apéndice del certiorari, Resolución [del Comisionado], págs. 179-193.

<u>Resolución</u> del Comisionado. No obstante, mediante una <u>Orden</u> escueta, el foro primario refrendó el dictamen.[9]

Inconforme, la señora Vélez presentó un recurso de <u>certiorari</u> ante el Tribunal de Apelaciones. Sin embargo, el 18 de junio de 2021, el Tribunal de Apelaciones notificó una <u>Resolución</u> en la cual denegó la expedición del auto solicitado. Ello, por colegir con el foro primario en cuanto a que, a consecuencia de la pandemia, el Departamento no brindó servicios educativos desde el 16 de marzo de 2020. Por tanto, concluyó que no había razón para intervenir con el dictamen impugnado. Ante dicha determinación, la señora Vélez presentó una moción de reconsideración, la cual fue denegada.

Aún insatisfecha, el 20 de agosto de 2021, la señora Vélez acudió ante nos mediante una petición <u>certiorari</u>. En sus señalamientos de error, argumentó que los foros recurridos incidieron al concluir que el Departamento anunció el cierre del año escolar el 16 de marzo de 2020. Por consiguiente, objetó que se resolviera que los estudiantes de educación especial que no recibieron los servicios educativos relacionados no tienen derecho a recibirlos posteriormente de forma compensada basado en el supuesto de que el Departamento dejó de proveer servicios educativos generales a toda su matrícula desde la fecha aludida.

---

[9] <u>Íd.</u>, <u>Orden</u>, págs. 73-76.

El 10 de diciembre de 2021, **expedimos el recurso** a los fines de revisar las determinaciones de los foros recurridos. Luego de examinar los Alegatos de las partes, emitimos una Resolución y **ordenamos la celebración de una vista oral** para el 25 de marzo de 2022.

Sin embargo, días antes de la celebración de la vista oral, el Procurador General compareció mediante una Solicitud de desestimación por academicidad. En esta, argumentó que el Departamento había "reconsiderado" la postura que asumió durante el trámite de este litigio. Específicamente, anunció que, el 14 de marzo de 2022, promulgó una Determinación Administrativa mediante la cual accedió a brindar al estudiantado de educación especial los servicios dejados de recibir durante el periodo en cuestión compensatoriamente. Basado en lo anterior, el Procurador General solicitó la desestimación del recurso por haberse tornado académico dado a que, con esa acción administrativa, el Departamento concedió la totalidad del remedio solicitado por la señora Vélez.

Por su parte, mediante una Oposición a solicitud de desestimación por academicidad, la señora Vélez planteó que la determinación tomada por Educación no convertía en académico el recurso. Ello, particularmente, debido a que tal concesión no garantiza de manera clara que, en eventos similares subsiguientes, el Departamento no volvería a negar la procedencia de los servicios compensatorios. De igual forma, sostuvo que la conducta del Departamento es

susceptible a repetirse dado su craso incumplimiento con la Sentencia por estipulación y por razón de que la Determinación Administrativa carece de garras para asegurar su cumplimiento. **En ese sentido, enfatizó la necesidad de que este Tribunal emita un mandato puntual y claro que establezca el derecho del estudiantado de educación especial al acceso a los servicios educativos y relacionados y al mecanismo de compensación de servicios.**[10]

No obstante, los reclamos bien fundamentados de la señora Vélez se encontraron de frente con el inmenso muro de la doctrina de la academicidad impuesto por este Tribunal. En un ejercicio de extrema autolimitación, así arraigado en una visión restrictiva de la doctrina, una mayoría de este Foro se apega al tecnicismo inaplicable invocado por el Gobierno. De este modo, se pasa por alto que el contexto fáctico de esta controversia no la hace académica. Al contrario, según vimos, este caso es idóneo para pautar importantes aspectos normativos con relación al acceso a la educación del estudiantado con necesidades educativas especiales.

Por tanto, procedo a exponer los fundamentos por los cuales esta controversia no es académica y a resolverla en sus méritos. Veamos.

**II**

---

[10]Posteriormente, el Procurador General presentó una Réplica mediante la cual reiteró sus argumentos en cuanto a la supuesta academicidad de la controversia.

Como se sabe, la academicidad es una de las doctrinas que limitan la intervención judicial. Asoc. Fotoperiodistas v. Rivera Schatz, 180 DPR 920, 932 (2011). En consecuencia, un caso es académico cuando no existe una controversia real o cuando al dictarse una sentencia, por alguna razón, esta no tendría efectos prácticos sobre la controversia existente. San Gerónimo Caribe Proyect v. ARPe, 174 DPR 640, 652 (2008).

Ahora bien, este Tribunal ha reconocido una serie de excepciones a la doctrina de la academicidad que nos permite considerar un caso que, de otro modo, resultaría académico en cuanto a su resultado o efecto inmediato. Bhatia Gautier v. Gobernador, 199 DPR 59, 73 (2017) (citas omitidas); Pueblo v. Méndez Pérez, 193 DPR 781, 798 (2015) (Opinión de conformidad del Juez Asociado Señor Estrella Martínez). Las excepciones a la academicidad ocurren cuando se suscita "(1) una cuestión recurrente o susceptible de volver a ocurrir; (2) cuando la situación de hechos ha sido cambiada por el demandado, pero no tiene visos de permanencia, y (3) cuando subsisten consecuencias colaterales que tienen vigencia y actualidad". U.P.R. v. Laborde Torres y otros I, 180 DPR 253, 281 (2010) (citas omitidas).

Particularmente, estas excepciones adquieren prominencia cuando se trata de controversias de alto interés público y se pretende proteger los intereses de la justicia. Consejo de Titulares v. Chamah Martínez, 202

DPR 173, 218 (2019) (Sentencia) (Opinión disidente del Juez Asociado Señor Estrella Martínez); Pueblo v. Jorge Moreu, 201 DPR 799, 812 (2019) (Resolución) (Voto particular disidente del Juez Asociado Señor Estrella Martínez). Entiéndase, la doctrina de la academicidad no limita nuestras facultades revisoras absolutamente. Pueblo v. Jorge Moreu, supra, pág. 812.

Tras evaluar las posturas de las partes en cuanto a este extremo, considero que, si bien el Departamento promulgó una Determinación Administrativa en la que "reconsidera" su postura en cuanto a la compensación de servicios educativos y relacionados durante el periodo aquí en disputa, ello no convierte en académica la controversia ante nuestra consideración. Me explico.

De entrada, debo destacar que la presente controversia está revestida de alto interés público, puesto que el reclamo de la parte peticionaria está cimentado en el derecho constitucional a la educación y en las normativas federales y estatales que garantizan el acceso a una educación pública, apropiada y en acorde con las necesidades del estudiantado de educación especial.

Precisamente, en U.P.R. v. Laborde Torres y otros I, supra, la controversia versaba, al igual que en el caso de autos, sobre un asunto de alto interés público que incidía en los derechos constitucionales de los estudiantes. Allí, este Tribunal determinó que la cesación voluntaria de la conducta que inició el pleito no tenía

visos de permanencia y, consecuentemente, concluyó que el caso no era académico.

Particularmente, y en cuanto la cesación voluntaria como una de las excepciones a la doctrina de la academicidad, este Foro expresó que:

> [L]a terminación voluntaria de una conducta no tornará académica una controversia salvo que los eventos subsiguientes hagan absolutamente claro que no es razonable esperar que la alegada conducta impugnada vuelva a ocurrir. […] Por eso, un caso es académico solo si: (1) puede asegurarse que la violación alegada no va a volver a ocurrir [,] y (2) el remedio provisional concedido o los eventos acaecidos han erradicado completa e irrevocablemente los efectos de la violación alegada.[11]

Ciertamente, es sobre la parte demandada —en este caso, el Departamento— en quien recae el peso de la prueba para demostrar la academicidad del pleito. "Es decir, corresponde a ésta demostrar que el cambio de conducta para culminar la controversia es permanente y no es razonable esperar que revierta". Íd., págs. 283-284.[12] Ello, pues según se expresó en U.P.R. v. Laborde Torres y otros I, supra, "el hecho de que un demandado desista voluntariamente de la conducta impugnada no priva

---

[11](Cita depurada). Íd., págs. 282-283.

[12]Resáltese que, en U.P.R. v. Laborde Torres y otros I, supra, se reiteró que "al examinar si un caso es académico, debemos evaluar los eventos **anteriores, próximos y futuros**, para determinar si la controversia entre las partes sigue viva y subsiste con el tiempo". (Negrillas suplidas). Íd., pág. 281 (cita omitida).

automáticamente a un tribunal de su autoridad para determinar la legalidad de esa conducta. De lo contrario, se dejaría libre a la parte demandada para volver a sus antiguas usanzas". (Cita depurada). Íd., pág. 282.

Aquí, dado el cuadro fáctico examinado previamente, no hay indicios de que la nueva postura del Departamento tenga visos de permanencia, sino que es, claramente, un subterfugio para evadir la revisión judicial. Esto se desprende de la propia conducta desplegada por el Departamento, quien abierta y consistentemente ha incumplido, y continúa incumpliendo, con la Sentencia por estipulación, específicamente con lo relacionado a su obligación de ofrecer oportunamente los servicios compensatorios adeudados a la matrícula de educación especial.

De hecho, el más reciente Informe de la Oficina de Monitoría ofrece datos reveladores al respecto.[13] Por ejemplo, para el año escolar 2019-2020, 36,232 estudiantes de educación especial requirieron 106,828 servicios compensatorios. **Al 6 de marzo de 2021, el Departamento aún adeudaba 87,578 servicios compensatorios a 30,203 estudiantes.**[14] Un (1) año después, **5,011 estudiantes**

_____

[13]Esta oficina es la encargada de fiscalizar e informar al Tribunal con relación al grado de cumplimiento del Departamento con los acuerdos alcanzados que dieron base a la Sentencia por estipulación.

[14]Oposición a solicitud de desestimación de la parte peticionaria, págs. 14-15.

**todavía no habían recibido 13,348 servicios compensatorios correspondientes a ese año escolar.**[15]

Para el año escolar 2020-2021, 34,605 estudiantes de educación especial requirieron 806,592 servicios compensatorios. Mas, **el Departamento únicamente proveyó 52,693 servicios compensatorios a 4,577 estudiantes.**[16] Surge del Informe que, para el 11 de marzo de 2022, **el Departamento aún no había provisto 337,197 servicios compensatorios a un total de 14,018 estudiantes del Programa de Educación Especial.**[17] Como vemos, el incumplimiento del Departamento es reiterado, consistente y patente.

**En ese sentido, cabe preguntarse si el Departamento, aun estando a la merced de sanciones económicas y potenciales desacatos, incumple con un mandato del Poder Judicial, ¿qué garantía existe de que cumplirá con una escueta Determinación Administrativa aprobada con el aparente propósito de eludir la revisión judicial?** Recordemos que el Departamento tomó esta acción luego de más de dos (2) años litigando el caso, lo que incluyó la

---

[15]Véase, Actualización del Informe de progreso [con relación] a la estipulación núm.44, Anejo #1, pág. 1, Oposición a solicitud de desestimación de la parte peticionaria.

[16]Oposición a solicitud de desestimación de la parte peticionaria, pág. 15.

[17]Véase, Actualización del Informe de progreso [con relación] a la estipulación núm.44, Anejo #1, pág. 2, Oposición a solicitud de desestimación de la parte peticionaria.

presentación ante este Tribunal de su <u>Alegato</u> en defensa de su negativa a compensar los servicios. En ese sentido, sería ingenuo confiar en que, solo tras una decisión unilateral, abrupta y oportunista por parte del Departamento, su conducta reiterada de negar servicios educativos y relacionados al estudiantado de educación especial cesará. **La experiencia histórica y los datos actuales confirman lo contrario.**

De igual forma, este caso no es académico ya que la presente controversia es susceptible de repetirse y de evadir nuevamente la revisión judicial. El caso ante nos, satisface los tres requisitos para cumplir con esta excepción a la doctrina de la academicidad. A saber: (1) probabilidad de recurrencia; (2) identidad de las partes y (3) expectativa de que el asunto evada la revisión judicial. <u>Asoc. Fotoperiodistas v. Rivera Schatz</u>, supra, pág. 934.

En cuanto a la probabilidad de recurrencia debo enfatizar que aún persiste el estado de emergencia por motivo de la pandemia. Igualmente, debido a la amplia facultad que ostenta el Departamento de decidir unilateralmente si provee servicios compensatorios hay probabilidad de que ante eventos que trastoquen el semestre escolar el Departamento, nuevamente, niegue servicios educativos y relacionados a los estudiantes de educación especial. Respecto a la identidad de partes, estas son las mismas debido al pleito de clase y así

continuarán en la medida que persista el incumplimiento del Departamento con la <u>Sentencia por estipulación</u>. Finalmente, hay una gran expectativa de que el asunto evada la revisión judicial. Esto, ya que no hay certeza de que, en una ocasión futura, el Departamento procederá de conformidad con su <u>Determinación Administrativa</u>. En particular, porque de su contenido se desprende que la concesión de los servicios reclamados es producto de un ejercicio discrecional del Secretario del Departamento y no de un reconocimiento institucional a los derechos constitucionales que cobijan al estudiantado del Programa de Educación Especial. **Lo segundo es lo que solicita la señora Vélez y es lo que le niega el proceder mayoritario.**

Por ello, considero que, aun con la <u>Determinación Administrativa</u> del Departamento, persiste la controversia en cuanto a si esta agencia puede negar arbitrariamente los derechos constitucionales y estatutarios de esa población estudiantil. Este aspecto, por sí solo, demuestra la existencia de una consecuencia colateral que tiene vigencia y actualidad, la cual, a su vez, se desprende del reclamo de la señora Vélez.

Por todo lo anterior, estoy convencido de que esta controversia es justiciable. Por consiguiente, era urgente resolverla en sus méritos y ejercer nuestro rol de pautar el Derecho. Mediante la inacción de una mayoría de este Tribunal, se desperdicia la oportunidad de impartirle

certeza al derecho constitucional a la educación que cobija al estudiantado de educación especial.

Por tanto, desde el disenso procedo a exponer el derecho aplicable y a resolver en los méritos la presente controversia.

**III**

**A.**

Según adelanté, el derecho a la educación es de rango constitucional en nuestro ordenamiento jurídico. Orraca López v. ELA, 192 DPR 31, 40 (2014); AMPR v. Srio. Educación, E.L.A, 178 DPR 253, 270 (2010); Declet Ríos v. Dpto. de Educación, 177 DPR 765, 773 (2009). Esto, en virtud de la Carta de Derechos de la Constitución de Puerto Rico la cual, expresamente, dispone que "[t]oda persona tiene derecho a una educación que propenda al pleno desarrollo de su personalidad y al fortalecimiento del respeto de los derechos del hombre y de las libertades fundamentales". Art. II, Sec. 5. Const. ELA, LPRA, Tomo 1, ed. 2016, pág. 297.

En acorde con ello, hemos expresado que el fin de este precepto constitucional "es definir las aspiraciones colectivas sobre la educación y crear un sistema de enseñanza pública a niveles primario y secundario exclusivamente ... sujeto a que el Estado tenga los recursos necesarios para su implantación". Declet Ríos v. Dpto. de Educación, supra, pág. 773. (citas omitidas). De igual forma, hemos reconocido que la educación de la niñez

y juventud puertorriqueña es de vital importancia para el Estado. Asoc. Maestros P.R. v. Srio. Educación, 137 DPR 528, 568 (1994).

En ese sentido, la cláusula constitucional precitada reconoce un derecho general de toda persona a la educación, la cual debe propender al pleno desarrollo de su personalidad. Así pues, "este derecho aplica independientemente de la edad de la persona, el nivel de enseñanza pertinente o la naturaleza de la entidad".[18] **Entiéndase, esta cobija a quienes precisan de una educación especializada y ajustada a sus particularidades.**

Por su parte, la ley federal conocida como el Individuals with Disabilities Education Act, 20 USCA sec. 1400 et seq. (Ley IDEA), define la educación especial como aquella instrucción especialmente diseñada, sin costo para los padres, enfocada en atender las necesidades únicas de un estudiante con discapacidad. 20 USCA sec. 1401(29). Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 580 US ___ (2017), 137 S.Ct. 988, 994 (2017). Por tanto, la Ley IDEA, supra, tiene el propósito de asegurar que todos los menores con necesidades especiales reciban educación pública, apropiada y gratuita en atención a sus necesidades particulares, como también el proteger los derechos de estos y de sus respectivos padres o tutores.

---

[18]J. Farinacci Fernós, La Carta de Derechos, 1ra ed., San Juan, Editorial de la Universidad Interamericana de Puerto Rico, 2021, pág. 103.

Orraca López v. ELA, supra, pág. 42. Esto, con el objetivo de prepararlos para oportunidades de empleo en el futuro y, sobre todo, para que lleven sus vidas de manera independiente, entre otros aspectos. 20 USCA sec. 1400(d)(1)(A).

Por ello, todos los estados que reciban fondos bajo el estatuto precitado tienen que establecer programas de educación especial públicos, gratuitos y apropiados que atiendan las necesidades particulares de cada estudiante.[19] 20 USCA sec. 1415(a); Declet Ríos v. Dpto. de Educación, supra, pág. 776. En consecuencia, Puerto Rico, al recibir fondos federales para educación especial, tiene que regirse por el mandato y las regulaciones establecidas al amparo de la Ley IDEA, supra. Íd.

Adicionalmente, cónsono con el mandato constitucional y la legislación federal discutida, a nivel estatal se ha promulgado legislación para atender los retos educativos de los menores con necesidades especiales. Orraca López v. ELA, supra, pág. 41. Esto, principalmente, a través de las leyes orgánicas del Departamento, las cuales constituyen la piedra angular de la educación pública en Puerto Rico. Así pues, la Ley de Reforma Educativa de Puerto Rico, Ley Núm. 85-2018, 3 LPRA 9801 et seq. (Ley Núm. 85), reformó el sistema educativo del País con el

---

[19]Véase, 20 USCA sec. 1401(31): "The term "State" means each of the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, and each of the outlying areas."

objetivo de que los estudiantes reciban una educación de calidad que les permita desarrollar al máximo sus capacidades para convertirse en ciudadanos plenos que contribuyan al bienestar de Puerto Rico. Asoc. Maestros v. Depto. Educación, 200 DPR 974, 1013 (2018) (Opinión de conformidad del Juez Asociado Señor Rivera García).

En lo pertinente, la ley precitada define la educación especial como la "[e]nseñanza pública gratuita especialmente diseñada para responder a las necesidades particulares de la persona con discapacidad, en el ambiente menos restrictivo". Art. 1.03 de la Ley Núm. 85, supra, 3 LPRA sec. 9801b(18). A su vez, en el capítulo sobre educación especial, se establece que será política pública del Departamento asegurar que el estudiante con discapacidad tenga acceso y reciba "una educación pública, gratuita y apropiada, fundamentada en una evaluación diseñada especialmente para atender sus necesidades particulares, en el ambiente menos restrictivo". Art. 10.01 de la Ley Núm. 85, supra, 3 LPRA sec. 9810.

Por su parte, la Ley de Servicios Educativos Integrales para Personas con Impedimentos, Ley Núm. 51-1996, 18 LPRA sec. 1351 et seq. (Ley Núm. 51), tiene como propósito principal garantizar una educación pública, gratuita y apropiada a los estudiantes con necesidades especiales que asistan a las escuelas públicas del País. Orraca López v. ELA, supra, pág. 41. Para ello, se creó la Secretaría Auxiliar de Servicios Educativos Integrales

para Personas con Impedimentos como un componente operacional del Departamento. Art. 5 de la Ley Núm. 51, supra, 18 LPRA sec. 1354. Esta es la encargada de, entre otros asuntos, prestar servicios educativos y relacionados a personas con impedimentos y de coordinar que estos se presten con prontitud. Íd. Tomando en consideración lo anterior, la Ley Núm. 51, supra, establece que la política pública del Gobierno es garantizar:

> **Una educación pública, gratuita y apropiada, en el ambiente menos restrictivo posible, <u>especialmente diseñada de acuerdo a las necesidades individuales de las personas con impedimentos y con todos los servicios relacionados indispensables para su desarrollo</u>, según se establezca en su plan individualizado de servicios,** y lo más cerca posible de las demás personas sin impedimentos. Esto aplica tanto a las escuelas públicas del Departamento de Educación como a las Escuelas de la Comunidad bajo la administración del Instituto de Reforma Educativa.[20]

A su vez, el estatuto antecitado nos ofrece varios conceptos pertinentes a esta controversia. Por ejemplo, se define como impedimento "[c]ualquier condición física, mental o emocional que limite o interfiera con el desarrollo o la capacidad de aprendizaje de la persona". Art. 2, Ley Núm. 51, supra, 18 LPRA 1351(10). Por tanto, para propósitos del estatuto una persona con impedimento será toda aquella que, hasta los veintiún (21) años, "por razón de su impedimento, requier[a] educación especial y

---

[20](Negrillas y énfasis suplidos). 18 LPRA sec. 1353.

servicios relacionados". Íd. Así pues, la **educación especial es la "[e]nseñanza pública gratuita especialmente diseñada para responder a las necesidades particulares de la persona con impedimentos, en el ambiente menos restrictivo"**. (Negrillas suplidas). Íd.

Asimismo, **un servicio educativo relacionado se caracteriza por ser un servicio de salud y de apoyo indispensable que se requiere para que la persona con impedimentos se beneficie al máximo de la educación que recibe**. Art. 2, Ley Núm. 51, supra, 18 LPRA 1351(22). De esta forma, los servicios relacionados son clave para apoyar, desarrollar y corregir aquellas habilidades que interfieren en el aspecto educativo del estudiante.

Esencialmente, **los servicios educativos relacionados consisten en:**

> [a] **Transportación**[;]
> [b] **[O]tros servicios de apoyo del desarrollo y correctivos** según se requieran para ayudar a un niño con discapacidades a beneficiarse de la educación especial, **e incluyen:**
> > [1] **patología del habla-lenguaje,**
> > [2] **servicios de audiología,**
> > [3] **servicios de interpretación,**
> > [4] **servicios sicológicos, de terapia física y ocupacional,**
> > [5] **recreación, incluyendo recreación terapéutica,**
> > [6] **identificación y evaluación temprana de discapacidades en niños,**
> > [7] **servicios de asesoría, incluyendo consejería en rehabilitación,**
> > [8] **servicios de orientación y movilidad,**

> [9] **servicios médicos para propósitos diagnósticos o de evaluación.**
> [c] **Los servicios relacionados también incluyen servicios de salud escolar y de enfermera escolar, servicios de trabajo social en las escuelas y consejería y adiestramiento de padres.**[21]

**B.**

Según reseñamos, mediante la Sentencia por estipulación en 2002, las partes pusieron fin al pleito de injunction instado por la señora Vélez.[22] De un examen de su contenido surge que el Departamento se comprometió a continuar "ofreciendo a los miembros de la clase demandante, ubicados tanto en el sistema público como en el privado, todos los servicios educativos, relacionados y suplementarios establecidos de acuerdo a la Constitución, legislación y reglamentación de Puerto Rico y de los Estados Unidos".[23] Para instrumentar esa disposición, se creó un procedimiento mediante el cual, en un término no mayor de sesenta (60) días, a cada estudiante elegible al Programa de Educación Especial se

---

[21](Negrillas suplidas). Manual de Procedimientos de Educación Especial para el año escolar, julio de 2020, pág. 116. Se advierte que se optó por separar las oraciones pertinentes de la sección precitada con el propósito exclusivo de ilustrar una mejor comprensión de lo expuesto.

[22]Toda vez que el tribunal aprobó las estipulaciones, estas obligan a las partes a su cumplimiento. Mun. de San Juan v. Prof. Research, 171 DPR 219, 238 (2007).

[23]Apéndice del certiorari, Sentencia por estipulación, págs. 246-305.

le prepararía un Programa de Estudios Individualizado (PEI), el cual debe reflejar el tipo de servicios educativos, suplementarios y relacionados que necesita el estudiante. A tono con lo anterior, la estipulación treinta y cuatro (34) establece que el "PEI tendrá que ser revisado al menos cinco (5) días <u>antes</u> de finalizar el año escolar, con el propósito de asegurar que todo estudiante tenga un PEI vigente al inicio del próximo año escolar".[24]

**Por otra parte, otro mecanismo para asegurar la continuidad en el acceso a servicios relacionados es el de la <u>reposición o compensación del servicio</u>. Esta alternativa opera en caso de que no esté disponible el servicio relacionado <u>durante el curso del año escolar que le corresponda y se brinda durante el verano o durante el próximo año escolar</u>**.[25] Lo primordial para que el estudiante tenga derecho a un servicio compensatorio es que tenga un PEI vigente y que durante el año escolar en curso no esté disponible el servicio educativo o relacionado o se interrumpa el servicio por falta de recursos.[26]

C.

---

[24]Íd.

[25]Íd.

[26]<u>Manual de Procedimientos</u>, <u>supra</u>, pág. 192.

Por último, es preciso establecer el contexto fáctico en el que ocurre el caso de autos. Como adelantamos, nos encontramos ante una secuela directa de la emergencia salubrista acaecida a inicios del 2020, cuando la Organización Mundial de la Salud (OMS) declaró una pandemia debido al riesgo global de propagación del Covid-19. En consecuencia, la OMS instruyó a todos los gobiernos a tomar medidas salubristas, incluido el distanciamiento físico, para contener la propagación del Covid-19.

Puerto Rico no estuvo exento de la emergencia de salud, por lo que cada Poder Constitucional adoptó medidas urgentes de contingencia para confrontarla. En lo pertinente, el Poder Ejecutivo, mediante la Orden Ejecutiva del 12 de marzo de 2020, declaró un estado de emergencia ante el inminente impacto del Covid-19 en nuestra Isla.[27] Acto seguido, el 15 de marzo de 2020, se emitió la Orden Ejecutiva OE-2020-23, en la cual se ordenó el cierre de las operaciones gubernamentales, excepto aquellas relacionadas a servicios esenciales, así como el cierre de todos los comercios en Puerto Rico hasta el 30 de marzo de 2020.[28] Como resultado de ello, los planteles

---

[27]Orden Ejecutiva Núm. 2020-20, *Para declarar un Estado de Emergencia ante el inminente impacto del Coronavirus,* (12 de marzo de 2020), Disponible en https://www.estado.pr.gov/es/ordenes-ejecutivas/ (última visita, 1 de abril de 2022).

[28]Orden Ejecutiva Núm. 2020-23, *Para viabilizar los cierres necesarios gubernamentales y privados para combatir los efectos del Coronavirus y controlar el riesgo de contagio,* (15 de marzo de 2020), Disponible en

educativos públicos también cerraron y no se permitió la asistencia física de maestros y estudiantes a los centros escolares.

Paralelamente, el Departamento de Educación federal emitió una Guía en cuanto a cómo atender la amenaza del Covid-19 en las escuelas sin violentar los derechos civiles de los estudiantes.[29] En cuanto al deber de proveer servicios educativos y relacionados durante la emergencia del Covid-19, la Guía dispuso lo siguiente:

> **Question A-1:** Is an LEA [Local Education AGENCY] required to continue to provide a free appropriate public education (FAPE) to students with disabilities during a school closure caused by a COVID-19 outbreak?
> **Answer:** […]
> **If an LEA closes its schools to slow or stop the spread of COVID-19, and does not provide any educational services to the general student population,** then an LEA would not be required to provide services to students with disabilities during that same period of time.[30]

Según se desprende de la directriz antecitada, se requiere la concurrencia de dos (2) condiciones para que una agencia educativa local no tenga la obligación de proveer servicios educativos al estudiantado de educación especial en el contexto pandémico. En primer lugar,

_____

https://www.estado.pr.gov/es/ordenes-ejecutivas/ (última visita, 1 de abril de 2022).

[29]Apéndice del certiorari, Questions and answers on providing services to children with disabilities during coronavirus disease 2019 outbreak, págs. 149-157.

[30](Negrillas suplidas). Íd., pág. 150.

requiere que se ordene el cierre de las escuelas para reducir o detener la propagación del virus. En segundo lugar, que **no** se provea ningún servicio educativo a la matrícula general de estudiantes. **Solo si se satisfacen ambos criterios, entonces no habrá derecho a exigir que se le provean servicios educativos al estudiante de educación especial**. Como veremos, esto no fue lo que ocurrió en el caso de autos.

IV

La señora Vélez argumenta ante este Tribunal que los foros recurridos erraron al razonar que el Departamento cesó de proveer servicios educativos a partir del 16 de marzo de 2020 y, por ello, concluir que el estudiantado del Programa de Educación Especial no tiene derecho a reclamar los servicios educativos relacionados de forma compensada por aquellos que no recibió durante el segundo semestre escolar del año escolar 2019-2020 a consecuencia del cierre escolar.[31]

Por su parte, en su Alegato, el Gobierno mantiene su postura en cuanto a que el semestre escolar culminó el 16 de marzo de 2020 y que, a partir de ese momento, **no proveyó servicios educativos** regulares a toda su matrícula. Dado

---

[31]Adviértase que no pasamos juicio sobre la procedencia de la compensación de servicios educativos relacionados a los estudiantes de la región suroeste quienes a consecuencia del terremoto no recibieron esos servicios desde enero de 2020. Esa controversia fue atendida por el Comisionado, quien resolvió que procedía la compensación únicamente hasta la fecha del cierre de las escuelas como consecuencia de la pandemia.

lo anterior, aduce que no corresponde reconocer al estudiantado de educación especial el derecho a servicios compensatorios por los servicios educativos relacionados que no brindó a partir de la fecha aludida. Adicionalmente, en una especie de argumento en la alternativa, sostiene que, posterior al 16 de marzo de 2020, únicamente ofreció módulos remediales mediante métodos alternos de enseñanza virtuales. Señala que estos solo tuvieron el propósito de reforzar las destrezas de grado atendidas previamente y que los estudiantes que no pudieran accederlos no serían penalizados, por lo que no pueden catalogarse propiamente como un servicio educativo.

A la luz de estos hechos y el derecho antes reseñado, nos corresponde examinar si el Departamento satisface los dos (2) requisitos establecidos por las guías federales para no tener que compensar por aquellos servicios educativos relacionados que no brindó a la matrícula de educación especial durante el periodo de tiempo objeto de esta controversia. A saber, debemos determinar si el Departamento: (1) decretó un cierre de escuelas y (2) dejó de proveer servicios educativos a su matrícula general. Conforme se indicó previamente, no hay controversia con respecto al primer requisito.

Ahora bien, debo concluir que el Departamento no cumple con el segundo requisito, ya que, a pesar de las circunstancias excepcionales en la que se encontraba, este adoptó una política de continuidad de servicios mediante

la educación a distancia, la cual se extendió hasta el 5 de junio de 2020, fecha en que culminó el año escolar 2019-2020. Contrario a lo aducido por el Departamento, esta política de continuidad de servicios se confirma con las comunicaciones y acciones que impartió a partir del cierre físico de las escuelas. Veamos.

El **15 de marzo de 2020**, es decir, el mismo día en que se ordenó el cierre de las escuelas, el Departamento anunció las opciones y alternativas académicas para sus estudiantes debido al **cierre parcial** de las escuelas.[32] En ella, el entonces Secretario del Departamento, Sr. Eligio Hernández Pérez, anunció que se estarían adoptando diferentes alternativas educativas para "**para mantener la continuidad de los procesos educativos, ante la emergencia que enfrenta Puerto Rico y el cierre parcial de las escuelas**".[33] Estas alternativas para la continuidad del semestre incluyeron: el uso de la aplicación EduPR; módulos remediales para las cinco (5) materias básicas (Ciencias, Español, Estudios Sociales, Inglés y Matemáticas); la continuación de los cursos en línea de la agencia para los grados 9 a 12, y la continuación de los cursos en línea con el apoyo de las universidades de

---

[32]Apéndice del certiorari, Opciones y alternativas académicas para los estudiantes del sistema educativo debido al cierre parcial del 16 al 30 de marzo de 2020, págs. 109-121.

[33](Negrillas y énfasis suplidos). Íd.

Puerto Rico. Finalmente se instruyó al magisterio a preparar un "**plan semanal de alternativas de estudio para la continuación de los servicios educativos**".[34]

Un curso de acción similar se tomó con los estudiantes de educación especial del sistema público el **20 de marzo de 2020**, cuando el Departamento comunicó las opciones y alternativas académicas para sus estudiantes del Programa de Educación Especial.[35] Allí, el Secretario Asociado, Lcdo. Eliezer Ramos Parés, reafirmó que el Departamento adoptó diferentes alternativas educativas para "**mantener la continuidad de los servicios educativos**" mediante las plataformas anunciadas previamente.[36]

Posteriormente, el **27 de marzo de 2020**, el Secretario Asociado emitió una nueva comunicación con el propósito de autorizar la continuidad de servicios educativos a los estudiantes de educación especial ubicados por el Departamento de Educación en escuelas privadas durante la emergencia del Covid-19.[37] De entrada, el Departamento volvió a enfatizar que "**adoptó medidas alternas que**

---

[34] (Negrillas y énfasis suplidos). Íd.

[35] Apéndice del certiorari, Opciones y alternativas académicas para los estudiantes que reciben servicios educativos del programa de educación especial ante el cierre parcial del 16 al 30 de marzo de 2020, págs. 124-126.

[36] (Negrillas y énfasis suplidos). Íd.

[37] Apéndice del certiorari, Autorización de continuidad de servicios educativos a estudiantes de educación especial ubicados por el Departamento en escuelas privadas durante la emergencia del Covid-19, págs. 126-127.

**propicien la continuidad del proceso educativo a todos los estudiantes**, para los cuales se incluye los estudiantes ubicados por la Agencia en Instituciones Privadas bajo compra de servicios".[38] Basado en lo anterior, instruyó a esas instituciones a que garantizaran la accesibilidad de trabajos y la comunicación con los padres para ofrecer continuidad en el servicio educativo. Es necesario resaltar que, en esta comunicación, el Departamento señaló que, para efectos de facturación, "**la prestación de servicios** al estudiante, **a distancia** y haciendo uso de la tecnología, **se considerará servicio educativo**".[39]

Cónsono con la política de continuidad de servicios educativos, el **28 de marzo de 2020**, el Departamento emitió dos (2) comunicaciones adicionales en las cuales **anunció la disponibilidad de varios servicios**. Así, en la primera informó que, por medio del Programa de Consejería Profesional en el Escenario Escolar, se ofrecería apoyo mediante facilitadores docentes de consejería y consejeros profesionales en el área académica, ocupacional y de carrera y personal a estudiantes, maestros y padres, madres o encargados.[40]

_____

[38] (Negrillas y énfasis suplidos). Íd.

[39] (Negrillas y énfasis suplidos). Íd.

[40] Apéndice del certiorari, Alternativas de apoyo a ofrecer para estudiantes, maestros, padres, madres o encargados ante la emergencia del Covid-19 por el Programa de consejería profesional en el escenario escolar, págs. 176-178.

En la segunda, el Departamento notificó el **restablecimiento inmediato** de servicios relacionados a los estudiantes de educación especial mediante métodos alternos a distancia o en línea.[41] Para ello, el Secretario Asociado autorizó "a las corporaciones e individuos que brindan servicios relacionados, […], a que ofrezcan terapias en línea para **continuar con el impacto en las áreas que se estaban trabajando previo a la emergencia** y, así, continuar atendiendo las necesidades de nuestros niños y jóvenes de educación especial".[42] Como vemos, incluso los servicios relacionados se reanudaron tiempo después de haber sido suspendidos.[43]

Según las estadísticas recopiladas por el Departamento, desde ese momento y hasta la culminación del semestre, se realizaron 61,112 sesiones de terapia en línea, lo que pone de manifiesto la política de continuidad

---

[41]Apéndice del certiorari, Autorización de servicios relacionados en línea a estudiantes de educación especial durante el periodo de la emergencia por el Covid-19, págs. 311-316.

[42](Negrillas y énfasis suplidos). Íd.

[43]El **14 de marzo de 2020**, el Departamento anunció la suspensión de todos los servicios relacionados de los estudiantes de educación especial. Allí se estableció que la "**paralización o suspensión de estos servicios relacionados, así como el tiempo de suspensión, deben tomarse en cuenta en cualquier caso de regresión significativa para establecer un plan compensatorio, en caso de ser necesario**". (Negrillas suplidas). Véase, Apéndice del certiorari, Servicios a estudiantes de educación especial- Covid-2019, págs. 122-123.

de servicios adoptada por el Departamento. No obstante, en el curso ordinario de operaciones, el Departamento provee mensualmente un promedio de 428 mil sesiones de terapia a más de 74 mil estudiantes de educación especial.[44]

Nótese cómo en las primeras dos (2) semanas posteriores al cierre de las escuelas, el Departamento proyectó y, en efecto, continuó con las labores académicas del semestre escolar, las cuales contemplaron servicios pedagógicos y relacionados a través de la educación a distancia. Esta política de continuidad de servicios impactó tanto a los estudiantes de la corriente regular como a los de educación especial. Es decir, el Departamento movilizó sus servicios educativos y de apoyo de las aulas presenciales a las virtuales.

De hecho, lo anterior se confirma a su vez con la misiva del **23 de abril de 2020** emitida por el Departamento, intitulada Cierre de año escolar 2019-2020. En ella, el Secretario del Departamento expresó el mensaje siguiente:

> El [Departamento], comprende que, por el estado de emergencia vigente, causado por los sismos y el coronavirus, el quehacer educativo presencial se haya ajustado significativamente. Dentro de esta

---

[44]Ello demuestra que estos servicios no estuvieron disponibles ni accesibles a la totalidad de la matrícula de educación especial. Véase, Lcdo. Eliezer Ramos Parés, Ponencia de la Secretaria Auxiliar de Educación Especial: Plan de reapertura para Educación Especial, (19 de febrero de 2021) pág. 11. Disponible en, https://issuu.com/primerahora/docs/ponencia dept. educac ion vista p blica 1 (última visita, 1 de abril de 2022).

> situación reconoce el esfuerzo que muchos docentes han realizado para continuar atendiendo a nuestros estudiantes a pesar de no contar con las herramientas y recursos adecuados.
>
> **La solución más fácil pudo haber sido la suspensión del semestre, sin embargo, nos mantuvimos invirtiendo el tiempo en lo más importante que podemos brindar a un estudiante, la educación.**[45]

Tras ese preámbulo, el Departamento procedió a anunciar el calendario de actividades para concluir los trabajos académicos **"del año escolar en curso"**.[46] Para ello, durante el mes de mayo de 2020, los estudiantes tendrían que culminar cualquier proceso académico y el personal docente debía registrar sus puntuaciones, dando paso a que concluyeran los cursos en línea el 26 de mayo de 2020. Además, el Departamento fijó los parámetros con respecto a cómo evaluar la asistencia y cómo se adjudicarían los promedios de las notas. A su vez, se instruyó al personal a que promoviera de grado a todos los estudiantes y resaltó que, aunque los estudiantes que no pudieron acceder a los servicios de educación a distancia no serían penalizados, los que sí lo hicieron recibirían notas por ello. **Finalmente, estableció el 5 de junio de**

---

[45] (Negrillas suplidas). Apéndice del <u>certiorari</u>, <u>Cierre de año escolar 2019-2020: Asistencia, evaluación, promoción y graduación de estudiantes de escuelas del Departamento de Educación de Puerto Rico</u>, págs. 128-133.

[46] (Negrillas suplidas). Íd.

**2020 como la fecha de cierre para el año escolar 2019-2020.**

Es por esto que tampoco convence la argumentación del Departamento en cuanto a que, a partir del 16 de marzo de 2020, este únicamente proveyó servicios educativos no regulares con la intención de reforzar las destrezas ya trabajadas durante el año escolar. En primer lugar, según se indicó, las guías del Departamento de Educación federal no especifican el tipo de servicio que se tiene que brindar para que surja la obligación de proveer servicios a la matrícula de educación especial. Al contrario, estas apuntan a un criterio amplio y flexible dirigido a beneficiar, no a penalizar, al estudiantado de educación especial en tiempos de pandemia.[47] En todo caso, esa admisión pone de relieve el hecho de que el Departamento impartió servicios educativos durante ese periodo de tiempo, sin importar si fue con el propósito de cubrir material nuevo o de reforzar destrezas de grado ya trabajadas.

Lo antes detallado me permite afirmar, sin lugar a duda, que el Departamento, lejos de cesar el ofrecimiento de servicios educativos el 15 de marzo de 2020, realizó un esfuerzo continuo para brindar tales servicios apremiantes aun en los momentos de mayor incertidumbre social en el país. **Nótese que, en esas comunicaciones**

---

[47]Véase, Apéndice del <u>certiorari</u>, <u>Supplemental Fact Sheet</u>, págs. 317-321.

**emitidas al inicio de la emergencia salubrista, en ningún momento el Departamento consignó que daba por concluido el semestre escolar. Todo lo contrario.** Se desprende de estas que el Departamento anunció que, aún bajo las condiciones imperantes en el País, continuaría proveyendo servicios educativos a los estudiantes del sistema público mediante la educación a distancia hasta el 5 de junio de 2020, cuando culminaría el año escolar 2019-2020. De la documentación examinada, la cual refleja la postura del Departamento en aquel momento, es forzoso concluir que, en efecto, el Departamento **continuó proveyendo servicios educativos a toda su matrícula.**

Todo esto hace insostenible la contención del Procurador General, quien en su Alegato afirma que el segundo semestre del año escolar 2019-2020 finalizó el 15 marzo de 2020. En ese sentido, la postura del Gobierno en cuanto a que no procede que el Departamento provea de forma compensada los servicios educativos relacionados a los estudiantes de educación especial es derrotada por sus propias acciones y comunicaciones contemporáneas a la comunidad estudiantil y al País. **Es evidente la contradicción insalvable entre las acciones que realizó el Departamento durante este tiempo para dar servicios y la postura asumida ante los tribunales para negar servicios vitales a los estudiantes de educación especial.** No hay justificación legal alguna para que este, hasta el momento en que ordenamos la celebración de una vista oral,

decidiera que no tiene obligación de compensar a aquellos estudiantes que en ese momento no las pudieron recibir.

**Por tanto, debimos haber pautado que el Departamento tiene la obligación de suministrar los servicios educativos relacionados a través del mecanismo de servicios compensatorios a todo aquel estudiante del Programa de Educación Especial que se quedó sin recibirlos entre el 16 de marzo y el 5 de junio de 2020.** Como se expuso, si bien es cierto que el Departamento cerró las escuelas, este no paralizó por completo la enseñanza a los miles de estudiantes que componen el sistema público de educación. Más bien, las trasladó de las aulas presenciales hacia las aulas virtuales.

Al arribar a esta conclusión, no paso por alto las grandes vicisitudes que se experimentaron durante ese periodo de tiempo, lo que incluye las dificultades inherentes a brindar servicios educativos relacionados en tiempos de pandemia. Sin embargo, ello no es óbice para que el Departamento niegue compensar los servicios dejados de prestar arbitrariamente. Esto no solo es cónsono con el derecho normativo aplicable, sino también con las nociones más básicas de la justicia. Máxime, cuando se trata de un servicio de vital trascendencia para el estudiantado de educación especial.

## V

En definitiva, el presente caso constituía el escenario ideal y necesario para que este Tribunal

impartiera un contenido sustantivo al derecho a la educación que le asiste a todo estudiante de educación especial. Esto, particularmente, en cuanto a su derecho a recibir servicios educativos y relacionados de forma compensada. De esta forma, se hubiese concedido un remedio adecuado, completo y oportuno en este pleito de clase de gran interés público.

Al adoptarse otro curso de acción, considero necesario reproducir parte de mis expresiones emitidas en Vélez et al. v. Depto. Educación et al., 194 DPR 477 (2016) (Sentencia) (Opinión particular del Juez Asociado Señor Estrella Martínez), las cuales adquieren mayor significancia tras la renuencia de una mayoría de este Tribunal a dar certeza al derecho a un acceso adecuado a la educación:

> [E]s imperativo señalar que la controversia ante nos pone nuevamente de relieve el problema de la falta de acceso a la justicia que, lamentablemente, permea en nuestra sociedad; problema que se acentúa cuando se trata, como en el caso de epígrafe, de pleitos revestidos de alto interés público, cuyas particularidades urgen un mayor acceso de los ciudadanos a los foros judiciales. Por ello, **considero que negarse a actuar en estos momentos conllev[a] ignorar la atención diligente que requiere este caso y, por ende, cerrarles las puertas a unos padres, madres y encargados que por años han reclamado que se les conceda el remedio que en derecho les asiste.** En ese sentido, recordemos que el Poder Judicial debe velar y asegurar que todos los ciudadanos tengan un

mayor acceso efectivo a los tribunales.[48]

Hoy, las barreras al acceso a la justicia se acrecientan para el estudiantado de educación especial. Esta vez, los reclamos de la parte peticionaria encuentran la puerta del Poder Judicial cerrada con un candado revestido de indiferencia y complacencia. De esta forma, la corriente mayoritaria claudica a su deber de pautar el Derecho y despacha livianamente esta controversia.

Para ello, este Tribunal aplica de forma autómata la doctrina de la academicidad, creando una barrera injustificada que impide decidir en sus méritos una controversia que, a todas luces, favorece y vindica a los sujetos de derecho que estamos llamados a proteger desde el Poder Judicial: las y los estudiantes del Programa de Educación Especial.

**Por tanto, ante el patrón de incumplimiento del Gobierno con las estipulaciones recogidas en la Sentencia de este pleito de clase y ante la jurisdicción que ostenta el Poder Judicial para atender dichos incumplimientos, procedía revocar a los foros recurridos y no descansar en la promesa de una escueta Determinación Administrativa del Departamento que no pone punto final a la controversia. Adviértase que el documento presentado por el Departamento tiene menor peso que la Resolución que denegó los servicios compensatorios, tampoco equivale a una estipulación entre**

---

[48](Negrillas suplidas). Íd., págs. 488-489.

las partes, su contenido no dispone de mecanismos autoejecutables y, menos aún, se provee el remedio adecuado completo y oportuno a los miles de estudiantes que necesitan esa compensación.

Los jueces y juezas no debemos creer lo que nadie más creería. Al tomar conocimiento de esas realidades históricas y jurídicas, descargo la responsabilidad de objetivamente no creer que esta controversia se resolvió. Hace falta carácter, el carácter vinculante entre lo prometido y lo debido.

Ante ello, disiento.


                                    Luis F. Estrella Martínez
                                         Juez Asociado